SCHUMAN v. FLECKENSTEIN. See Case No. 12,826.

SCHUMANN (UNITED STATES v.). See Case No. 16,235.

SCHUMENANT (UNITED STATES v.). See Case No. 16,236.

---

## Case No. 12,491.

### In re SCHUMPERT.

[8 N. B. R. 415.] [1]

District Court, N. D. Mississippi. 1873.

BANKRUPTCY — FAILURE TO KEEP BOOKS —GROWING CROPS—FIFTY PER CENT. CLAUSE.

1. Where a bankrupt, after March, 1867, fails to keep proper books of account, such books as will enable an ordinary bookkeeper to determine his true financial condition,—his discharge will be refused.

[Cited in Re Archenbrown, Case No. 505.]

[Cited in brief in Re Howard, 59 Vt. 595, 10 Atl. 719.]

2. Growing crops unmatured should be entered by the bankrupt on his schedule of personal property.

3. For a debt contracted in 1863, a note was given at twelve months, and each year thereafter until 1870—the old note was taken up and a new note given, the last note given in 1870. *Held*, this was not a debt contracted prior to January 1, 1869, but comes under the fifty per cent. clause.

In bankruptcy.

HILL, District Judge. This cause is submitted upon the exceptions and specifications filed by T. L. Schumpert, a creditor who has proved his debt, against the discharge of said bankrupt, answer and proofs. The specifications number from one to nineteen. The answer denies each and every allegation contained in these specifications, the only question being whether or not the bankrupt is entitled to his discharge. If any one of the specifications, being sufficient to refuse the discharge, is sustained by the proof, the consideration of the remaining specifications will become unnecessary, and only such will be considered as may be thought necessary as affording rules in similar cases. Therefore, as most easy of a satisfactory solution of the question for decision, the sixth specification and proof thereon will first be considered. This specification is in the following words: "Because said bankrupt, being a merchant and tradesman, has not, subsequently to the passage of this act, kept proper books of account, in this: that he has not kept an invoice book; that he has not kept a cash book, a blotter, a day book, journal, ledger, or any other books of account, show-

---

1 [Reprinted by permission.]

ing the condition of his business, at any time since the 2d of March, 1867." The bankrupt has, in obedience to the order of the court, filed three books, which he admits are all the books kept by him; these books show that he carried on the business of a merchant and tradesman from a period before the 2d of March, 1867, to the 1st of January, 1870. These books are more memorandums than books of account, and were kept in such a manner that neither the bankrupt nor anyone else can from them make any correct estimate of the condition of the business at any time during this period.

The bankrupt act wisely provides that merchants and tradesmen who purchase and sell upon credit, and who may become applicants for the beneficent provisions of the law, shall keep proper books of account, so as at any time to exhibit to those dealing with them and giving them credit, the condition of their pecuniary affairs, and upon a failure so to do, as a penalty for such neglect withholds from them the discharge to which they would otherwise be entitled. This being in the nature of a penalty only applies to transactions after the passage of the law [of 1867 (14 Stat. 517)]. This requirement is important for another reason, and that is, to enable the assignee to understand from the books the condition of the estate, and to properly settle it up. The question of a fraudulent intent in omitting to keep the proper books, is not involved; it is simply the omission to do that which is required and for the reasons stated. This is evident, from this provision of the act itself, without reference to the judicial construction placed upon it; were, however, such construction necessary, to maintain this position, it will be found in the decisions referred to by Mr. Bump, in his treatise on the bankrupt law and proceedings under it (pages 428 and 429). It is unimportant in what particular form the books are kept, or in what kind of books, if they are sufficient to exhibit the true financial condition of the merchant or tradesmen. Ordinarily there is an invoice book showing the purchases, a day book showing the daily sales, a cash book showing the cash received and cash paid out, a ledger and journal; but these different accounts, if the business is small, may be kept in the same book, but the accounts, whether kept in one or more books, must exhibit the financial condition of the merchant or tradesman. The books in this case failing to make such exhibit, for this reason, if there were no others, I am not at liberty to grant the discharge.

The first specification raises a question on which I am asked by counsel to decide, and whilst I had supposed there was no doubt upon the subject, and have adopted rules regulating proceedings in relation to it, as it is the first time it has been judicially raised, and as it is one which may be of importance in similar cases, will be considered. And that is, did the growing or ungathered crop of corn, cotton and potatoes, pass to the assignee under the assignment, and should they be placed upon the schedules as personal property? The first specification avers that the bankrupt did have in his possession, and own, and hold, as his own property, a crop of corn, cotton and potatoes raised on his farm, and most of which was ungathered when he filed his petition praying to be declared a bankrupt on the 26th day of September, 1870, which he failed to place on his schedules, and afterwards gathered and appropriated to his own use, and that in his affidavit to his petition and schedules he testified that they contained a true statement of all his estate, real and personal, which he then knew to be false. There is no question but that he owned the crops, and that he failed to include them in his schedules; but it is insisted by the bankrupt's counsel that these crops, which were then ungathered, constituted a part of the realty, and did not pass to the assignee as personal property, and should not have been embraced in the schedules. All the authorities hold growing crops, which are annually produced by the cultivator, to be emblements, and upon the death of the owner of the fee, and before their severance from the soil, they go to the personal representative, and not to the party taking the land as heirs at law; they also go to the personal representative of the tenant for life, if planted or sown before the death of the tenant. It is true, that when the owner sows or plants the crop, and before it is gathered devises the land, or sells and conveys it, and dies before the crop is gathered, the crop goes to the devisee or vendee; but this is upon the presumption that the testator or vendor so intended it, and not that it constituted a part of the realty. Such is the common law doctrine. Has this rule been changed by the statutes of this state? In the Revised Code of 1857, at page 389, and continued in the present Code, it is provided that in the trial of an action of ejectment, when the jury shall find for the plaintiff, and the defendant shall have a growing crop upon the land, the jury shall assess a reasonable rent for such time as may be necessary to make and gather the crop, and upon its being secured or paid the writ of possession shall not issue until the crop is made and gathered. Again, on page 448, it is provided that if an executor or administrator should deem it proper that the crop growing at the death of the testator or intestate be disposed of, the probate court upon application may decree a sale thereof at public or private sale, or if the court shall deem it best may direct the crop to be completed and gathered by the executor or administrator, and sold, and the proceeds, less expenses, to become personal assets. The supreme court of this state in the case of McCormick v. McCormick, 40 Miss. 760, whilst holding (the crop having only been planted at the death of the intestate, and cultivated and gathered by the heir at law) the administrator was not entitled thereto, intimate

in a proper proceeding he would be entitled to recover the value of the crop at the time the heir took possession of it, or that the administrator might have applied for a sale of the crop as it stood at the death of the intestate. The ruling of the court in this case clearly treats the crop, although only then planted, as personal and not real estate, and which is doubtlessly the correct rule. The crop in this case had been fully cultivated, and mainly matured before the filing of the petition, and should have been scheduled and accounted for according to the rules adopted on this subject. Having determined that on other grounds the bankrupt is not entitled to his discharge, it is not necessary to further consider the questions raised by this specification.

A question of more difficulty is raised by specification eleven, which alleges that the exceptor's demand is a judgment obtained on the 9th of June, 1870, and that the assets which have come to the hands of the assignee are insufficient to pay fifty per cent. of the amount due thereon. The bankrupt act as amended requires that unless the assets are equal to fifty per centum on the debts proved, in which the bankrupt is the principal debtor, contracted since the 1st of January, 1869, he shall not obtain his discharge unless a majority in number and value of those to whom he has become the principal debtor since that time, and who shall have proved their claims, shall file their assent in writing thereto. This provision alludes to the time the contract was made, and not to the date of payment. The proof shows that the note upon which the judgment was rendered was executed after the 1st of January, 1869. The original indebtedness was for money received belonging to the excepting creditor in 1863, for which he gave his note, which subsequently was renewed, the last renewal being the note upon which the judgment was rendered, at which time the former note was surrendered, and, so far as the proof shows, all the former notes were surrendered at and before the giving of the last note. The question for solution is, was the renewal of the note a contract within the meaning of this provision of the bankrupt law, or does it refer to the original indebtedness? The object of the law was to give to all those who had become involved to a greater amount than they had means to pay, an opportunity to be relieved from their liabilities upon a surrender of their property and assets of every kind, but, as a check upon future indebtedness and embarrassment, provided the application must be made within one year after the passage of the act, or, if not, that the assets should equal fifty per centum of the debts proved against the estate, or a majority in number and amount of those who proved their debts should agree thereto. The time was afterwards extended to the 1st of January, 1869, and this provision again amended by granting the discharge as to all debts contracted prior to the 1st of January, 1869, and to all debts subsequently contracted in which the bankrupt was not the principal debtor, and to all cases in which the assets equal fifty per centum upon the debts proven in which the bankrupt is the principal debtor, and a majority in number and amount shall file their written assent thereto. Had the bankrupt in this case not seen proper to renew the note, and there had been no other obstacle in the way, he would have been entitled to his discharge, but he voluntarily entered into a renewal of his engagement after the 1st of January, 1869. It is, however, true, that at the time the last amendment had not been passed, and so far as it then appeared he had nothing to lose by the renewal, but I am inclined to the opinion that it was a new contract, though based upon the former consideration; in other words, that it was a payment and discharge of the old indebtedness by the execution of the new note. It is a well settled rule that the acceptance of a note for a pre-existing debt does not discharge the original debt unless it is paid or transferred, or there is such laches upon the part of the holder that will discharge the debtor, or unless it is agreed between the parties that it shall operate as a discharge of the pre-existing debt. Some of the authorities hold that an express agreement must be proven, others, that it must be expressed, if not implied from the conduct and acts of the parties. I am satisfied that this agreement may, like almost every other fact, be established by circumstantial testimony, and that when a new note is executed, and the old one surrendered to the maker, the presumption arises that the new note was accepted in payment and discharge of the old note, unless sufficient proof is adduced to rebut this presumption, which has not been done in this case. Had the old note not been given up and surrendered this presumption would not have arisen, but it would still have left a difficult question of solution, as to whether or not the renewal of the note was not, under this provision of the bankrupt law, a new contract so as to subject the bankrupt to the fifty per centum clause. It is not like a case in which the consideration is the point to be determined. In such a case you may go back to the original consideration if insufficient, but it is more like the application of the statute of limitation, the bar of which is prevented by the execution of a new note or other acknowledgment of indebtedness, or the giving of a new promise for the payment of a debt discharged under proceedings in bankruptcy, which, it has been held, will bind the promisor. The question being, so far as I am informed, an entirely new one, I have examined it with all the lights available and have come to the conclusion that had there been no other difficulty in the way the bankrupt could not be discharged from this debt.